UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBIE JONES,

        Petitioner,

                                                    Case Number: 2:11-CV-14449

v.                                               Honorable Patrick J. Duggan

STEVE RIVARD,

       Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Bobbie Jones ("Petitioner"), a state prisoner currently incarcerated at the St. Louis Correctional Facility in St. Louis, Michigan, filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner is challenging convictions in 2008 in the Circuit Court for Saginaw County, Michigan. He is serving concurrent life sentences as a fourth habitual offender for first-degree premeditated murder and felon-in-possession convictions, and a consecutive two year sentence for a felony-firearm conviction. Petitioner's application challenges these convictions on the ground that trial counsel was ineffective in failing to object to the jury instruction that he had a duty to retreat. For the reasons stated herein, the petition for a writ of habeas corpus is denied.

## I.  Factual and Procedural Background

Petitioner was convicted of the above offenses following a jury trial in Saginaw County Circuit Court.  The Michigan Court of Appeals recited and relied on the following facts in denying Petitioner's appeal on direct review:

> Defendant and the victim, Travell Staves, became neighbors in July of 2006.  According to defendant, their relationship was friendly until October of that year, when defendant asked Staves about some stolen marijuana plants and Staves accused defendant of breaking into Staves' garage.  Defendant testified that Staves threatened on multiple occasions to kill defendant and his family because he believed defendant had broken into his garage.  At one point, defendant thought he saw Staves with a pistol and, on another occasion, Staves tried to run over defendant with his car.  Defendant also testified that Staves threw rocks at his house on two occasions.
>
> According to defendant, on May 29, 2006, while he was leaving a party store with his friend Jason Young, Staves ran his car into the back of defendant's car.  Defendant testified that he believed Staves had a gun and that Staves threatened him, telling defendant that "him and Burt Street [a gang] were gonna come break into my house and kill everything that was moving."  Defendant testified that he and Staves then went to their respective homes, but then Staves walked toward defendant's home, still threatening to kill defendant.  Defendant testified that he did not call the police at this time because on previous occasions he had called and they had not responded.  Defendant testified that he then took his .22 caliber rifle from his home, went into his backyard, positioned himself near the corner of his garage, and shot Staves.  According to defendant, he feared for his life at the time of the shooting, and felt that he would have been killed had he not killed Staves.
>
> Defendant said that he panicked after shooting Staves.  After first concealing his car license plate, he dropped it off at his fiancée's workplace, left a note in it, and then walked toward the police station

to turn himself in. While defendant was walking to the police station, he said, he was stopped and arrested.

Young testified that he was aware that defendant believed Staves had stolen his marijuana plants and that he had observed the dirt trail leading "almost up to [Staves'] door" the morning after the plants were stolen. He testified that, months before the killing, Staves had threatened to "F [defendant's] crackhead ass up." Young testified that on the day of the killing, he was at the party store with defendant when some "commotion" broke out between defendant and Staves. Although Young testified that he did not actually see or hear whether Staves ran into the back of defendant's car, he said that Staves was repeatedly saying that defendant "don't know nothing about Burt Street, and I'm gonna kick his door and kill everything in there moving." Young tried to convince Staves to "squash" the feud between the men, but Staves only repeated his threats to "kill [defendant] and everybody in his house." Young said he left the party store a short time after defendant and Staves did, and when he reached defendant's house, defendant was in the street next to his car. Young said that defendant called to Young to close defendant's back door, which was open. Young closed defendant's back door, and then noticed Staves lying where he had been shot.

Johnny Batton testified that he could see defendant's property from his rear window and that on the day in question, he saw defendant leave his house with a long gun, position himself near the corner of his garage. Batton heard a car pulling into Staves's driveway, heard the car door shut, and saw and heard defendant fire two shots at Staves. According to Batton, Staves was not carrying a weapon and looked as though he had just gotten off from work. When Batton saw defendant shoot Staves, Staves was moving from his own driveway toward his own back door. He testified that defendant then moved toward the fallen Staves and fired at least four more shots. Peter Holm, whose home is catty-corner to defendant's, testified that he heard several shots fired on the day in question. Shortly after hearing the shots, Holm saw defendant running out of his backyard carrying a rifle.

> Saginaw Police Department Officer Luis Vargas testified that he was the first officer on the scene after the shooting. He saw a man, later identified as Young, waving to attract his attention. Vargas testified that Staves was found in his own driveway "laying near the doorway and the grill." Vargas checked Staves for a pulse and for breath when he arrived, but detected neither. Vargas never saw a weapon "in the area of the body." Saginaw Police Department Detective James Vondette was told by a witness that defendant had been standing by his garage and found several fired cartridge casings in that area. Detective Sergeant Ryan Larrison, a Michigan State Police firearms analyst, testified that he was able to match the found cartridge cases to defendant's rifle. Although he could not match the bullets recovered from Staves's body to the rifle, Larrison testified that they matched the rifle's caliber.
>
> Medical examiner Kanu Virani, MD, performed an autopsy on Staves and determined that Staves had five gunshot wounds and that two chest wounds penetrated vital organs and would have killed Staves within minutes, even with medical attention.

*People v. Jones*, No. 288737, 2010 WL 1979278, *1-2 (Mich. Ct. App. May 18, 2010). This recitation of the facts is presumed correct on habeas review in accordance with 28 U.S.C. § 2254(e)(1). *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009). Petitioner has not rebutted this presumption by clear and convincing evidence.

Petitioner appealed his conviction to the Michigan Court of Appeals, which affirmed his convictions on May 18, 2010. *Jones*, 2010 WL 1979278. The Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Jones*, 488 Mich. 913, 789 N.W.2d 466 (2010).

Petitioner then filed the pending petition on October 11, 2011. He raises this claim:

> Did the trial court err by denying defendant's motion for new trial in which he claimed that he was deprived of a fair trial by ineffective assistance of counsel where the court instructed the jury (without objection) that defendant had a duty to retreat before using self-defense despite the presence of evidence showing that he was within the curtilage of his dwelling, in light of M.C.L. 768.21c stating that the duty to retreat before using deadly force is not required if an individual is in his or her own dwelling or within the curtilage of that dwelling?

(ECF No. 1.)

## II.   Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if

the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 364-65, 120 S. Ct. 1495, 1498 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S. Ct. at 1522.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, – U.S. – , 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

*Harrington v. Richter*, – U.S. – , 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003)).  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Id.*

Although § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent.  *Harrington*, 131 S. Ct. at 786.  Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 2796 n.5 (1979)) (Stevens, J.,

concurring)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

Additionally, a state court's factual determinations are entitled to a presumption of correctness on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, – U.S. –, 131 S. Ct. 1388, 1398 (2011).

## III. Analysis

Petitioner contends that the trial court denied him his right to a fair trial by denying his motion for a new trial based upon the ineffective assistance of counsel. Specifically, Petitioner argues that his attorney was ineffective in failing to object to the trial court's erroneous jury instruction that he had a duty to retreat.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2053, 2064 (1984). A petitioner may

show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689, 104 S. Ct. at 2066. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687, 104 S. Ct. at 2064.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. A court's review of counsel's performance must be "highly deferential." *Id.* at 689, 104 S. Ct. at 2065. Habeas relief may be granted only if the state-court decision unreasonably applied *Strickland*'s standard for evaluating ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23, 129 S. Ct. 1411, 1419-20 (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Id.* at 123, 129 S. Ct. at 1420 (internal quotation omitted).

In this case, to evaluate counsel's performance, the Court first considers the Michigan Court of Appeals' holding regarding the appropriateness of the given

9

instructions. The state court first reviewed the instructions given, including the instruction that, "[i]f the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force in self-defense." *Jones*, 2010 WL 1979278, at * 2. The court then rejected Petitioner's argument that, because he was within the bounds of the curtilage of his dwelling, he was entitled to an instruction that he had no duty to retreat, reasoning:

> Before the jury could reach the question of whether defendant had a duty to retreat, it first had to conclude that defendant honestly and reasonably believed his life was in imminent danger when he acted. *See People v. Riddle*, 467 Mich. 116, 127, 649 N.W.2d 20 (2002) ("[T]he killing of another person in self-defense is justifiable homicide only if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself."). On the record, we conclude that no reasonable juror could so find.
>
> The evidence showed that Staves pulled up to his own home, in his own driveway. Defendant sat next to his garage with a rifle by his side, waiting for Staves. Defendant admitted that he had retrieved his rifle and took up his position next to his garage in time to see Staves exit the car. Staves was not carrying a weapon and defendant never saw Staves with a weapon on that, or any other, occasion. Defendant then shot Staves as Staves was still in his own driveway and walking toward his own backdoor. Defendant then shot Staves several more times after Staves was lying on the ground injured. The jury was also provided a jail telephone recording, in which defendant admitted that he went home and waited for Staves because he was "fed up" with Staves harassing him. As the trial court stated when it denied defendant's motion for a new trial, "the Court was convinced this

> gentleman was laying in wait . . . and drilled this victim . . . as he pulled up, got out of his car and literally executed him and that there was no fear that he feared for his life."
>
> Under the circumstances, no reasonable juror could find that defendant honestly and reasonably believed that his life was in imminent danger so as to necessitate deadly force to prevent such harm. *Riddle*, 467 Mich. at 127, 649 N.W.2d 30. Absent an honest and reasonable belief that deadly force was necessary, a duty to retreat, or lack thereof, is irrelevant.
>
> Indeed, even if defendant's counsel had requested CJI 7.16(2), we conclude that trial court would have properly denied the request. The language of the jury instruction provides that a person need not retreat "if attacked in [his/her] own home," "if the person reasonably believes an attacker is about to use a deadly weapon," or "if the person is subject to fierce, sudden, and violent attack." Even acknowledging that MCL 768.21c(1) extended the area to include the curtilage, the fact remains that there is no evidence defendant was attacked while in his curtilage. Indeed, there is no evidence that defendant was attacked at all. The common element to the exception to the duty to retreat, indeed the entire premise of self-defense, is predicated on being attacked. Furthermore, a person who is threatened elsewhere may not go to their own home and lie in wait for the threatener and claim self-defense under the castle-doctrine unless the threatener subsequently threatens the person at their dwelling or within its curtilage. Thus, because Staves did not threaten or attack defendant while defendant was within the curtilage of his home, defendant was not entitled to an instruction based on MCL 768.21c, namely CJI2d 7.16(2).

*Jones*, 2010 WL 1979278 at *3.

After finding that the instructions given were proper and an instruction that Petitioner did not have a duty to retreat unwarranted, the Michigan Court of Appeals concluded that defense counsel was not ineffective in failing to request

11

this instruction or in failing to object to the instructions given. *Id.* at *4. "[S]tate courts are the ultimate expositors of state law." *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S. Ct. 1881, 1886 (1975). This Court must defer to the state court's determination that a "no duty to retreat" instruction was not appropriate under state law and the facts of this case. *Seymour v. Walker*, 224 F.3d 542, 558 (6th Cir. 2000). Counsel cannot be deemed ineffective for failing to raise a meritless objection or failing to request an instruction unsupported under State law. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."). The state court's holding that counsel was not ineffective in failing to raise a meritless objection was not contrary to or an unreasonable application of *Strickland*. As such, habeas relief is denied.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254. 28 U.S.C. § 2253 governs appeals in § 2254 proceedings and provides, in pertinent part: "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that when a district court denies a habeas petition on the merits of the claims

presented, a certificate may issue if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000). If a petitioner makes the requisite showing and a district court grants a certificate of appealability, the court must indicate the specific issue or issues for which the applicant made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(3).

Accordingly,

**IT IS ORDERED**, that Petitioner application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**;

**IT IS FURTHER ORDERED**, that a certificate of appealability shall not issue in this case.

Dated: December 9, 2013                    s/PATRICK J. DUGGAN
                                                          UNITED STATES DISTRICT JUDGE

Copies to:
Bobbie Jones, #263998
St. Louis Correctional Facility
8585 N. Croswell Road
St. Louis, MI 48880

Elizabeth M. Rivard, Esq.